UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| WANDA CATHERINE ELDAHAN, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| | ) | Case No. 3:22-cv-434 |
| v. | ) | |
| | ) | Judge Atchley |
| LINCOLN MEMORIAL UNIVERSITY, | ) | |
| | ) | Magistrate Judge Poplin |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendant Lincoln Memorial University's ("LMU") Motion for Summary Judgment [Doc. 19] and Motion in Limine [Doc. 30]. Defendant seeks dismissal of Plaintiff Wanda Catherine Eldahan's sole claim for age discrimination. For the reasons explained below, Defendant's Motion for Summary Judgment [Doc. 19] will be **DENIED**, and Defendant's Motion in Limine [Doc. 30] will be **DENIED WITHOUT PREJUDICE**.

**I. FACTUAL BACKGROUND**

Plaintiff joined LMU's Student Services Department in February 2015. At the time, she was 52 years old. [Doc. 21-17 at 11].[1] Plaintiff's title changed multiple times throughout her employment, but her job duties remained the same. [*Id.* at 13]. As the Director for Inclusion and Diversity Engagement, Plaintiff's responsibilities included developing diversity, equity, and inclusion ("DEI") programming, providing support for students, and more. [Doc. 20 at 3]. Plaintiff reported to several supervisors during her tenure. Her first four supervisors were Dean Robert Sabatini, Dr. Mary Ann Searle, Dr. Scott Oliver, and Dr. Megan Owens. [Doc. 20 at 3]. These

---

[1] For purposes of clarity, record citations are to the CM/ECF-stamped document and page number of each filing, rather than to any internal pagination, e.g. the page number of a deposition transcript.

supervisors often provided positive feedback in Plaintiff's annual performance evaluations. For example, in 2019, Oliver highlighted Plaintiff's provision of "intentional education" and indicated that faculty was "actively engaged and involved" in her programming. [Doc. 21-2 at 4]. Owens similarly noted in her 2020 evaluation that Plaintiff was "providing continued diversity programming to our students." [Doc. 21-3 at 5].

Following Owens's resignation as Dean of Students in March 2021, Assistant Dean of Students Elise Syoen and Executive Vice President for Administration Dr. Jody Goins became Plaintiff's interim supervisors. [Doc. 20 at 3]. Syoen was later promoted to Dean of Students, and she became Plaintiff's formal supervisor in September 2021. [Doc. 21-19 at 5]. Around the same time, LMU hired Blaze Bowers and named him the Assistant Vice President of Student Support. [Doc. 21-15 at 4]. Bowers became Syoen's direct supervisor, meaning he also indirectly supervised Plaintiff. [*Id.* at 5–6].

Unlike Plaintiff's former supervisors, Syoen and Bowers did not author positive performance reviews. To the contrary, both developed concerns with Plaintiff's performance, particularly with her poor attitude, lack of visibility on campus, and decline in programmatic output. Syoen and Bowers' concerns developed from their own observations and after hearing from Plaintiff's former supervisors. Syoen claims Plaintiff exhibited a negative attitude during an August 2021 meeting, and Owens and Oliver allegedly expressed concerns to Syoen regarding Plaintiff's programming, visibility on campus, and overall work performance. [Doc. 20 at 4]. For his part, Bowers concluded that Plaintiff lacked visibility on campus and offered programming that was neither innovative nor in line with "promising DEI practices." [Doc. 21-15 at 8].

Bowers and Syoen eventually decided to terminate Plaintiff. They informed Plaintiff of their decision in a meeting on November 12, 2021. [Doc. 21-17 at 26, 38]. Bowers told Plaintiff

2

that LMU wanted to take the department "in a different direction." [*Id.* at 26]. Later that same morning, LMU employee Jennifer Butcher asked Bowers why he fired Plaintiff, and he indicated that he wanted someone who was "more relatable to the students." [Doc. 21-16 at 8]. Bowers made a similar comment less than three weeks later in an email he sent to a different LMU employee, where he expressed a desire to replace Plaintiff with someone who "will resonate with students." [Doc. 21-13].

Shortly before Plaintiff's termination, Chief Human Resources Officer Amy Eads asked Bowers if any documentation reflected Plaintiff's history of performance issues. [Doc. 21-6]. Bowers responded on November 11, 2021, the day before he fired Plaintiff, and indicated that he and Syoen could draft documentation recounting their concerns. [*Id.*]. Together, Bowers and Syoen prepared a document titled "Observed Behaviors and Conversations with Wanda (Cathy) Eldahan" (hereinafter "Observed Behaviors Document"). [Doc. 21-9]. Bowers sent the Observed Behaviors Document to Eads on November 22, 2021. [Doc. 21-8].

The Observed Behaviors Document is the only document in the record that describes Plaintiff's apparent history of performance issues in detail.[2] It claims, among other things, that Plaintiff oversaw a steady decline in programming since 2015, failed to attend student events, and missed Zoom meetings regularly. [Doc. 21-9 at 1–2]. For these alleged shortcomings, Plaintiff insists that she was never disciplined or even criticized. She was never approached about a decline in programming or failure to attend events and meetings. [Doc. 21-14 at ¶ 6; Doc. 21-17 at 49]. The same was true of Bowers' claims of outdated programming, which Plaintiff states he never brought to her attention. [Doc. 21-14 at ¶ 4].

---

[2] Syoen claims that she took handwritten notes during her meetings with Plaintiff, but she admitted to throwing away those notes after transferring records to her iPad. [Doc. 21-19 at 17]. Bowers also indicated that no documentation describes Plaintiff's past performance issues besides the Observed Behaviors Document. [Doc. 21-15 at 10].

3

LMU did not replace Plaintiff until nine months later, when it hired 24-year-old Unique Earley. [Doc. 20 at 9]. Earley's job application does not denote any DEI experience. [Doc. 21-10]. Instead, her recent employment history included graduate assistantships at LMU's library and in university housing. [*Id.* at 3–4]. Earley's hiring formed part of a more than two-year period where LMU hired 19 employees in the Student Services Department, with 14 of them being below the age of 32. [Doc. 21-5 at 8].

## II. STANDARD OF REVIEW

"Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Sommer v. Davis*, 317 F. 3d 686, 690 (6th Cir. 2003) (citing FED. R. CIV. P. 56(c)). The moving party may satisfy its burden by producing evidence that demonstrates the absence of a genuine issue of material fact or "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). When ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Id.* (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## III. ANALYSIS

The Age Discrimination in Employment Act ("ADEA") "prevents employers from terminating an employee 'because of such individual's age.'" *Miles v. S. Cent. Hum. Res. Agency*, 946 F.3d 883, 887 (6th Cir. 2020) (quoting 29 U.S.C. § 623(a)(1)). ADEA claims premised on circumstantial evidence proceed under "the well-established *McDonnell Douglas* burden-shifting

4

framework." *Id.* (citing *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 620 (6th Cir. 2006)). That framework consists of three steps. First, the plaintiff must establish a prima facie case of age discrimination. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Second, once a prima facie case is established, the defendant must articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* Third, the burden shifts back to the plaintiff, who must demonstrate that the defendant's "proffered reasons are simply pretext for age discrimination." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804). "If the plaintiff satisfies this third step, the factfinder may reasonably infer discrimination." *Id.* (citing *Moffat v. Wal-Mart Stores, Inc.*, 624 F. App'x 341, 349 (6th Cir. 2015)).

Defendant concedes for purposes of summary judgment that Plaintiff can establish a prima facie case of age discrimination. [Doc. 20 at 11]. Plaintiff also appears to concede that Defendant has provided legitimate, nondiscriminatory reasons for her termination. [Doc. 21 at 13]. With these first two steps resolved, this case comes down to pretext. Pretext presents a relatively straightforward question: "did the employer fire the employee for the stated reason or not?" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009). "Plaintiffs typically show pretext in one of three ways: '(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that the proffered reasons were insufficient to motivate the employer's action.'" *Miles*, 946 F.3d at 888 (quoting *Chen*, 580 F.3d at 400). Though these three categories provide a "convenient way of marshaling evidence and focusing it on the ultimate inquiry" of pretext, they are not exhaustive, and plaintiffs remain free to advance other arguments. *Id.* (citations and internal quotation marks omitted).

Plaintiff raises numerous arguments to suggest that Defendant's proffered reasons for her termination—namely, a poor attitude and poor work performance—are pretext for age

5

discrimination. She points to her positive performance evaluations and lack of disciplinary history, Defendant's hiring practices, and allegedly ageist comments made in connection with her termination. Some of these arguments fit neatly within the three typical categories of proving pretext, but others do not. Regardless of how her arguments are ultimately characterized, Plaintiff has presented sufficient evidence to create a material factual dispute as to pretext.

## A. No Basis in Fact

Some of Plaintiff's arguments implicate the first method for establishing pretext: "that the proffered reasons had no basis in fact." *Miles*, 946 F.3d at 888 (quoting *Chen*, 580 F.3d at 400). This method of proof requires evidence showing "that the proffered bases for the plaintiff's discharge never happened." *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012) (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). Defendant includes among its reasons for firing Plaintiff that her DEI programming was outdated. [Doc. 20 at 13]. To show this reason lacks basis in fact, Plaintiff must present evidence demonstrating that her programming was not out of touch with current practices. Plaintiff has done precisely that.

Despite Assistant VP Bowers' contention that Plaintiff's programming was "not in line with promising DEI practices," Plaintiff avers that her programs reflected current DEI standards. [Doc. 21-15 at 29; Doc. 21-14 at ¶ 5]. Defendant invokes the honest belief rule in an attempt to avoid this dispute. [Doc. 24 at 14]. True, the honest belief rule can defend against a plaintiff's claim that her employer's proffered reason for termination lacked any basis in fact. *Miles*, 946 F.3d at 890 n.5. But the defense is properly applied only when the employer establishes that it reasonably relied on "particularized *facts* that were before it at the time the decision was made."

6

*Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 286 (6th Cir. 2012) (emphasis added) (quoting *Escher v. BWXT Y-12, LLC*, 627 F.3d 1020, 1030 (6th Cir. 2010)).

The honest belief rule is not properly applied here, where some of Defendant's proffered reasons for Plaintiff's termination are inherently subjective. After all, the purpose of the honest belief rule is to shield the employer from liability when it reasonably relies on certain facts to inform a termination decision, even if those facts are later proven to be "mistaken or incorrect." *Denhof v. City of Grand Rapids*, 494 F.3d 534, 543 (6th Cir. 2007). Defendant's opinions that Plaintiff implemented outdated programming and exhibited a poor attitude cannot be deemed incorrect later in time. Subjective opinions like these are not disprovable. Thus, this case is unlike the typical honest belief rule case, where third parties report the plaintiff's conduct to the employer, and the employer decides to terminate the plaintiff based on its honest belief at the time in the factual allegations. *See, e.g.*, *Lloyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 591 (6th Cir. 2014) (applying rule where the employer relied on multiple witness statements concerning the plaintiff's alleged insubordinate conduct and performed an investigation before terminating the plaintiff). Because Defendant based its termination in part on purely subjective beliefs concerning Plaintiff's performance, the honest belief rule is inapplicable.

Plaintiff advances multiple theories that cast doubt on the veracity of Defendant's proffered reasons for her termination. She highlights the lack of contemporaneous documentation or disciplinary history reflecting her alleged shortcomings on the job. Regarding the dearth of documentation, Plaintiff cites to *Underwood v. Yates Services, LLC*, No. 16-cv-03276, 2018 WL 4494839, at *10 (M.D. Tenn. Sept. 19, 2018) for the proposition that "[c]ourts in the Sixth Circuit have recognized that a lack of procedural documentation can suggest pretext." [Doc. 21 at 19]. In fact, *Underwood* merely states that "some limited case law" suggests that a lack of documentation

7

can provide evidence of pretext. 2018 WL 4494839, at *10. The Sixth Circuit, for its part, has explained that "failure to document contemporaneously does not necessarily give rise to an inference of pretext." *Kovacevic v. Am. Int'l Foods*, No. 22-1675, 2023 WL 3756063, at *6 (6th Cir. 2023) (citing *Abdulnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496, 503 (6th Cir. 2007)).

That the failure to document contemporaneously does "not necessarily" support a finding of pretext suggests it can in some circumstances. Plaintiff relies on *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 239–40 (5th Cir. 2015) as an example. There, the Fifth Circuit held that a lack of contemporaneous documentation, when combined with evidence demonstrating "why the absence of documentation matters," can support an inference of pretext. *Id.* at 240. The employer in *Burton* fired the plaintiff based on a "history of performance problems" but could only produce "a pair of dated, neutral performance reviews" and had attempted "to buttress the charge by compiling documentation" after the plaintiff's termination. *Id.* Under those circumstances, the lack of documentation mattered and could support a finding of pretext. *Id.*

So too here. Defendant claims it fired Plaintiff, at least in part, based on a decline in programming and her deficient performance. The Observed Behaviors Document, not prepared until after Plaintiff's termination, claims that Plaintiff's programming "has steadily decreased since Fall of 2015." [Doc. 21-9 at 1]. The document also charges Plaintiff with regularly missing Zoom meetings from February 2020 to May 2021. [*Id.*]. These allegations, among others, suggest that Plaintiff had a "history of performance problems" like the plaintiff in *Burton*. Despite this apparent history of problems, including an alleged decline in programming that spanned six years, there is no contemporaneous document in the record that reflects negatively on Plaintiff's performance. This lack of contemporaneous documentation, along with the Observed Behaviors
8

Document not being prepared until after Plaintiff's termination, provides at least some evidence of pretext. *Burton*, 798 F.3d at 240.[3]

Besides the Observed Behaviors Document, the only documentation in the record that speaks to Plaintiff's performance consists of largely positive performance evaluations. The Observed Behaviors Document traces Plaintiff's decline in programming back to 2015, but in Plaintiff's May 2020 performance evaluation, former Dean of Students Megan Owens stated that Plaintiff was "providing continued diversity programming to our students." [Doc. 21-3 at 5]. Owens also noted that Plaintiff "made a seamless transition to working from home," even though the Observed Behaviors Document indicates that Plaintiff began to regularly miss Zoom meetings beginning in February 2020, three months before Owens completed her section of Plaintiff's 2020 performance evaluation. [*Id.*].

Defendant argues that Plaintiff's performance evaluations fail to establish pretext for two reasons. First, Defendant emphasizes that the performance evaluations were primarily self-evaluations that Plaintiff filled out herself. [Doc. 24 at 7]. It is true that the performance evaluations consist mostly of Plaintiff assessing herself, but each evaluation includes space for supervisors to leave their own comments. [Docs. 21-1, 21-2, 21-3, 21-4]. With the exception of Plaintiff's March 2021 evaluation, where Owens offered no comments of her own, supervisors provided positive feedback in each of Plaintiff's annual evaluations. [*Id.*]. The inclusion of positive comments from supervisors could render these evaluations probative of pretext.

---

[3] Defendant emphasizes Syoen's testimony that whether to document performance issues is a matter of supervisor discretion. [Doc. 24 at 9]. That preparing documentation was discretionary could make the lack thereof less probative of pretext than in other cases, such as where the employer claims to follow "rigorous record-keeping policies" but still lacks any documentation. *See, e.g.*, *Laxton v. Gap Inc.*, 333 F.3d 572, 580 (5th Cir. 2003). Still, the absence of any documentation until after Plaintiff's termination, despite years of alleged performance issues, could contribute to a jury finding of pretext.

Defendant downplays the significance of Plaintiff's performance evaluations for a second reason: the positive feedback came from former supervisors. [Doc. 20 at 20]. Because Syoen and Bowers terminated Plaintiff, and neither of them penned the positive feedback, Defendant argues that the performance evaluations cannot demonstrate pretext. [*Id.*]. Defendant points to a pair of Sixth Circuit cases to suggest that these evaluations from former supervisors fail to show pretext. [*Id.* at 20–21]. Both of those cases discounted the significance of positive evaluations from former supervisors, but they did so when assessing the prima facie element of whether the plaintiff was otherwise qualified for her position, not when considering pretext. *Strickland v. Fed. Express Corp.*, 45 F. App'x 421, 424 (6th Cir. 2002) (holding that positive performance reviews from prior managers failed to establish that the plaintiff was otherwise qualified for her position); *Webb v. ServiceMaster BSC LLC*, 438 F. App'x 451, 453 (6th Cir. 2011) (holding that positive evaluations from prior years failed to demonstrate that the plaintiff was qualified at the time of his termination). Because *Strickland* and *Webb* discuss prior performance evaluations in the context of a prima facie element, they are of less legal significance when addressing pretext.

Perhaps more importantly, *Strickland* and *Webb* are factually distinguishable. Each case involved plaintiffs whose performance issues began after the new supervisor took over. *Strickland*, 45 F. App'x at 422–23 (noting that the plaintiff's performance issues began after the new supervisor who terminated her was appointed); *Webb*, 438 F. App'x at 452 (explaining that concerns with the plaintiff's performance began shortly after the new supervisor began overseeing him). That is not the case here. Instead, the Observed Behaviors Document divulges a years-long history of Plaintiff's performance issues that predate Syoen and Bowers becoming her supervisors, including a decline in programming since 2015 and a pattern of missing Zoom meetings in 2020

10

and 2021. [Doc. 21-9 at 1].[4] Yet it is during these same timeframes, when Plaintiff's performance was allegedly deficient, that Owens and other former supervisors provided positive feedback in their performance evaluations. [*See, e.g.*, Doc. 21-3 at 5].

The Court acknowledges that new supervisors like Syoen and Bowers are entitled to hold higher expectations for their employees than former supervisors. *See Metzler v. Fed. Home Loan Bank*, 464 F.3d 1164, 1176 n.5 (10th Cir. 2006) (noting that an inference of pretext "is even less permissible when a new supervisor is appointed, who is entitled to set his own standards and agenda" (citation omitted)). That general proposition loses its force, however, in a case like this, where the new supervisors base their termination decision at least in part on critiques raised by former supervisors. Indeed, Syoen indicated that Plaintiff's former supervisors, including Owens and Oliver, expressed concerns regarding Plaintiff's performance, even though they authored positive performance reviews during their periods of supervision. [Doc. 21-19 at 7]. The Observed Behaviors Document factors in these concerns and includes alleged performance issues that occurred when Owens and Oliver supervised Plaintiff. [Doc. 21-9]. Because the Observed Behaviors Document relies on allegedly problematic conduct that occurred during Owens and Oliver's supervision of Plaintiff, their corresponding positive performance evaluations can provide at least some evidence of pretext.

Taken together, the lack of contemporaneous documentation and existence of positive performance evaluations does establish some evidence of pretext. This evidence is far from compelling, however, and Plaintiff's stronger argument stems from her lack of disciplinary history on the job. The Sixth Circuit's decision in *Cicero v. Borg-Warner Automotive, Inc.* proves instructive on this point. 280 F.3d 579 (6th Cir. 2002). The employer in *Cicero* claimed it fired the

---

[4] Of note, Syoen testified that Plaintiff's decline in programming began in 2017 and 2018, even though the Observed Behaviors Document claims that the decline began in 2015. [Doc. 21-9 at 1; Doc. 21-19 at 8].

11

plaintiff based on his poor work performance. *Id.* at 589. The district court deemed the employer's proffered reason not to be pretext for age discrimination, but the Sixth Circuit reversed. *Id.*

In deciding that a factual dispute existed as to pretext, the Sixth Circuit emphasized, among other things, the employer's "lack of contemporaneous criticism" of the plaintiff's job performance. *Id.* The employer based its termination decision partially on the plaintiff's management of certain labor negotiations, yet the plaintiff's direct supervisor praised his work on the negotiations at the time, which cut against the company vice president's post-hoc claims of dissatisfaction. *Id.* at 590. Better yet, the employer awarded the plaintiff bonuses during the periods when his performance was allegedly inadequate. *Id.* While the employer claimed the plaintiff "failed in several ways throughout his employment, it never raised any serious complaints about his performance until after it fired him." *Id.* at 591–92. Quite the opposite, the employer praised the plaintiff's work and continued to award him with bonuses. *Id.* at 592. These facts proved sufficient to create a jury question as to pretext. *Id.* at 593.

This case involves similar facts. Just as the plaintiff in *Cicero* received no contemporaneous criticism from his employer, Plaintiff has presented evidence to suggest she was similarly left in the dark regarding her alleged performance issues, many of which occurred as she received positive performance evaluations.[5] The Observed Behaviors Document details numerous instances of subpar performance, including Plaintiff's decline in programming, failure to attend student events, and participation in Zoom meetings with her camera off. [Doc. 21-9 at 1–2]. For each of these instances, however, Plaintiff contends that she never received any contemporaneous

---

[5] True, the *Cicero* plaintiff's continued receipt of bonuses during his alleged periods of unsatisfactory performance may provide comparatively stronger evidence of pretext, but Plaintiff's receipt of positive performance evaluations during her alleged periods of unsatisfactory performance is sufficiently analogous. For example, the Observed Behaviors Document claims Plaintiff's decline in programming began in 2015, yet Oliver's performance evaluation from the 2018-19 academic year lauds Plaintiff for providing "intentional education" and notes that faculty was "actively engaged and involved" in her programming. [Doc. 21-2 at 4].

12

criticism from her employer. She avers that no supervisor ever told her that the amount of her programming had declined over time. [Doc. 21-14 at ¶ 6]. Plaintiff also testified that she was never disciplined for failing to attend student events, and Syoen could not recall whether she ever informed Plaintiff that it was an expectation for her to attend those events. [Doc. 21-17 at 49; Doc. 21-19 at 17]. Plaintiff's failure to activate her camera during Zoom meetings was similarly left unaddressed. Syoen did not recall disciplining Plaintiff for leaving her camera off, and fellow university employee Jennifer Butcher testified that she was unaware of employees being disciplined for having their cameras off. [Doc. 21-16 at 29; Doc. 21-19 at 18]; *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 590 (6th Cir. 2009) (holding that a factual dispute as to pretext existed where coworkers testified that the employer's proffered reasons for terminating the plaintiff did not typically result in discipline).

Plaintiff's absent disciplinary record is not confined to the performance issues listed in the Observed Behaviors Document. Though not specifically mentioned in the Observed Behaviors Document, Bowers characterized Plaintiff's programming as outdated and not in line with current DEI standards. [Doc. 21-15 at 8, 29–30]. Plaintiff once again indicates that she was never alerted to this issue. She avers that no one at LMU ever told her that her programming was obsolete in any way. [Doc. 21-14 at ¶ 4]. Bowers' deposition testimony lends support to this declaration; he explained that he never attempted to train Plaintiff to apprise her of his expectations and current DEI practices. [Doc. 21-15 at 29]. Whether through the Observed Behaviors Document or other means, LMU contends that Plaintiff "failed in several ways throughout [her] employment," but "it never raised any serious complaints about [her] performance until after it fired [her]." *Cicero*, 280 F.3d at 591–92. LMU's silence in the face numerous alleged performance issues, when combined

13

with the additional circumstance evidence of pretext, creates a factual dispute as to whether Plaintiff was fired because of her age.

### B. Insufficient to Motivate the Termination

Plaintiff also attempts to establish pretext by arguing that LMU's proffered reasons were insufficient to motivate her termination. "This route usually involves the plaintiff presenting evidence that other employees, particularly outside the protected class, were not disciplined although they engaged in 'substantially identical conduct to that which the employer contends motivated its discipline of the plaintiff.'" *McNeal v. City of Blue Ash*, 117 F.4th 887, 896 (6th Cir. 2024) (quoting *Chattman*, 686 F.3d at 349). When proceeding under this method of proof, the plaintiff need not show "an exact correlation" to the other employees who received more favorable treatment, but they generally must deal with the same supervisor and engage in the same conduct without "differentiating or mitigating circumstances." *Id.* (citations omitted); *Miles*, 946 F.3d at 893 (citation omitted).

To show that LMU's proffered reasons were insufficient to motivate her termination, Plaintiff relies on various deposition excerpts, including Syoen's testimony that other employees complained about their salaries just as Plaintiff had. [Doc. 21 at 21]. Plaintiff also points to Butcher's testimony that she was not aware of other employees being disciplined for failing to attend student events or joining Zoom meetings with their cameras off. [*Id.* at 22–23]. These excerpts lack crucial specifics. Indeed, nothing in the record reveals the names, ages, or supervisors of these other employees who allegedly received more favorable treatment despite engaging in similar conduct to Plaintiff. Without these details, the Court cannot conduct the comparator analysis that this particular method of proof demands, which means Plaintiff cannot demonstrate that LMU's proffered reasons were insufficient to motivate her termination.

14

Case 3:22-cv-00434-CEA-DCP Document 37 Filed 01/10/25 Page 14 of 20 PageID #: 788

C. Other Evidence of Pretext

Not all of Plaintiff's arguments fit neatly within the categories courts typically enumerate when analyzing pretext. Among these other arguments, Plaintiff relies on certain comments Bowers made after her termination, the qualifications of her eventual replacement, and LMU's hiring practices. The Court will address each of these arguments in turn.

1. Bowers' Comments

Plaintiff highlights two allegedly ageist comments Bowers made as additional evidence of pretext. "Isolated and ambiguous comments are too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 355 (6th Cir. 1998) (citations and internal quotation marks omitted). In assessing the probative value of allegedly discriminatory remarks, courts consider their substance, whether a decision-maker made them, and whether they were related to and made close in time to the adverse employment action. *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 325 (6th Cir. 2021) (citing *Diebel v. L & H Res., LLC*, 492 F. App'x 523, 527 (6th Cir. 2012)). None of these factors are dispositive, and courts should consider the remarks alongside any other evidence of pretext the plaintiff has presented. *Id.*; *Ercegovich*, 154 F.3d at 356.

Two of Bowers' comments underlie Plaintiff's pretext argument. First, Bowers told Butcher on the morning of Plaintiff's termination that he wanted someone who was "more relatable to the students." [Doc. 21-16 at 8]. Bowers made this comment after Butcher asked him why he fired Plaintiff earlier that morning. [*Id.*]. Second, less than three weeks following Plaintiff's termination, Bowers sent an email to an LMU employee indicating that he hoped to replace Plaintiff with someone who "will resonate with students." [Doc. 21-13]. These remarks, in Plaintiff's view, evince Bowers' desire to replace her with a younger individual. [Doc. 21 at 14].

15

Bowers made both remarks, and he indisputably played a role in Plaintiff's termination. [Doc. 21-15 at 9]. He and Syoen "were primarily responsible" for the decision to terminate Plaintiff. [*Id.* at 37]. The remarks also came close in time to Plaintiff's termination, particularly the first, which was made the very same morning. And the remarks related directly to the decision making process; they shed light on why Bowers decided to terminate Plaintiff. This "direct nexus between the allegedly discriminatory remarks and the challenged employment action affects the remarks' probative value." *Ercegovich*, 154 F.3d at 355 (alteration in original).

That leaves the substance of the remarks. Calling an employee a "dinosaur," "grandpa," and "over-the-hill" is unambiguously ageist, and only "a miniscule inference" is required to conclude that ageist sentiments underlie repeated questioning regarding an employee's retirement plans. *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 802, 813 (6th Cir. 2020). On the other hand, an employer's comments to a plaintiff's coworkers that they were "past their expiration date" and had "been in their job for too long" were not unambiguously ageist, as they could just as easily be referring to tenure rather than age. *Pelcha*, 988 F.3d at 327; *Blizzard*, 698 F.3d at 287.

Bowers' stated desires to find someone "more relatable to the students" and who would "resonate" with them are not unambiguously ageist. These remarks are not ageist slurs, and even Butcher acknowledged that Bowers' comment to her could refer to one's campus visibility or characteristics other than their age. [Doc. 21-16 at 8]. Considering their ambiguity, these remarks would likely be insufficient standing alone to create a factual dispute as to pretext. But the Court cannot view the remarks' substance in isolation. Instead, the Court must also consider who made the remarks, their timing, and whether they relate to the termination decision. All of these factors support Plaintiff's pretext argument: Bowers made the comments as a key decision maker, and the comments came close in time to Plaintiff's termination. Thus, when these factors are considered,

16

and when viewed against the backdrop of other evidence of pretext, Bowers' remarks provide at least some evidence to suggest Plaintiff was fired because of her age.

### 2. Plaintiff's Replacement

Approximately nine months after terminating Plaintiff, LMU hired 24-year-old Unique Earley as her replacement. [Doc. 20 at 9]. The parties dispute the relevance of this evidence. Plaintiff argues that Earley's hiring provides additional evidence of pretext, while Defendant contends that it is only relevant to establishing a prima facie case, not pretext.

A plaintiff must prove four elements to establish a prima facie case of age discrimination. *Pelcha*, 988 F.3d at 326. One of those elements requires the plaintiff to show that she was replaced by someone outside of the protected class. *Id.* Because this element is part of the prima facie case, Defendant asserts that Earley's hiring is irrelevant to demonstrating pretext. [Doc. 24 at 17]. It is axiomatic that establishing a prima facie case cannot be enough to establish pretext. Otherwise, "the pretext prong would be superfluous." *Miles*, 946 F.3d at 895 (citing *Alfrey v. AK Steel Corp.*, 211 F. App'x 393, 396 n.3 (6th Cir. 2006)). This practical reality explains why the Sixth Circuit held in *Miles* that the plaintiff's being replaced with someone twenty years younger could not "alone" establish pretext. *Id.*

That evidence from the prima facie case cannot "alone" establish pretext does not mean such evidence is categorically irrelevant to establishing pretext. After all, the Sixth Circuit has explained that courts should consider evidence from the prima facie stage when examining the plaintiff's showing of pretext. *Willard*, 952 F.3d at 810 (citations omitted). And the Sixth Circuit did exactly that in *Thompson v. UHHS Richmond Heights Hospital, Inc.*, 372 F. App'x 620 (6th Cir. 2010). In that case, the plaintiff presented evidence showing that she was more qualified than her replacement, including that she had more years of experience in the relevant field. *Id.* at 626.

This evidence, when considered alongside other evidence of pretext, was sufficient to create a factual dispute as to the plaintiff's wrongful termination claim. *Id.*

The same is true here. Plaintiff does not attempt to establish pretext solely by pointing to the age and qualifications of her replacement. To the contrary, Plaintiff presents this evidence in addition to the other indications of pretext already discussed: the absence of documentation, lack of disciplinary history, and Bowers' remarks. Earley's job application makes no mention of any prior experience in the DEI field. [Doc. 21-10]. Her recent employment history included graduate assistantships at the library and in university housing, and her listed skills do not expressly denote any DEI experience. [*Id.* at 2–4]. Defendant emphasizes that Plaintiff too lacked DEI experience when she was hired, but the more critical point is that Plaintiff had such experience when she was terminated. Even Bowers acknowledged that Plaintiff had some experience in the DEI field, which is more experience than Earley listed as having in her application. [Doc. 21-15 at 29]. Despite Bowers and Syoen's opinions that Earley's time as a student-athlete exposed her to DEI, a reasonable jury could conclude that Plaintiff, having been in a DEI-related position for more than six years, was more qualified than her replacement. LMU's hiring of Earley thus provides some additional evidence of pretext.

### 3. LMU's Hiring Practices

Plaintiff's final pretext argument focuses on LMU's hiring practices. She emphasizes that over a two-year span, Bowers and Syoen hired 19 employees in the Student Services Department, 14 of whom were below the age of 32. [Doc. 21 at 3]. This pattern of hiring, in Plaintiff's view, demonstrates LMU's inclination to drive out older employees like her and replace them with younger individuals.

An employer's hiring practices, when accompanied with other evidence, can establish pretext for age discrimination. *See Cicero*, 280 F.3d at 593. The hiring statistics relied upon, however, must have sufficient "explanatory power" to support a finding of pretext. *Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 944 (6th Cir. 1987) (citation omitted); *Martin v. U.S. Playing Card Co.*, No. 97-3391, 1998 WL 869970, at *4 (6th Cir. Dec. 4, 1998). Simply showing that an employer disproportionately hired younger employees, without additional context, is insufficient to establish pretext. *Simpson*, 823 F.2d at 943 (holding that the evidence the plaintiff presented during trial that 94.2% of his employer's hires over a two year period were under the age of 40 was insufficient to demonstrate pretext). These bare statistics lack significance because they reveal nothing about "the relative qualifications of those hired" and "vital information regarding the pool of applicants." *Id.*

The hiring statistics Plaintiff cites do not provide evidence of pretext. Just as hiring younger employees at a 94.2% rate did not demonstrate pretext in *Simpson*, nor does the fact that 14 of LMU's 19 hires were under the age of 32. [Doc.21-5 at 8]. It could be that only younger individuals applied for these positions, or that younger applicants were the most qualified. Without information regarding the applicant pool and these employees' relative qualifications, these bare statistics do nothing to demonstrate pretext. Even the statistics themselves lack much persuasive effect. Of the 19 new hires Plaintiff references, 10 of them simply involved one younger employee replacing another, such as a 22-year-old stepping in for a 24-year-old. [*Id.*]. On only one occasion was an employee over 40 replaced by someone under 40, and that was because the employee over 40 was promoted. [*Id.*]. These patterns, to the extent there are any, are hardly indicative of age discrimination and fail to support a theory of pretext.

## IV. CONCLUSION

A mere "scintilla of evidence" is insufficient to survive a motion for summary judgment. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Between the absence of documentation, lack of disciplinary history, Bowers' remarks, and LMU's hiring of Unique Earley, Plaintiff has presented more than a scintilla of evidence to survive summary judgment, albeit not by much. Defendant presents compelling evidence that it fired Plaintiff for reasons other than her age, but because a factual dispute remains as to pretext, Defendant's Motion for Summary Judgment [Doc. 19] is **DENIED**.

The Court's summary judgment ruling resolves at least some of the issued raised in Defendant's Motion in Limine. For this reason, Defendant's Motion in Limine [Doc. 30] is **DENIED WITHOUT PREJUDICE**. If Defendant wishes to refile any motion in limine, it is **ORDERED** to do so within **14 days** of this Order. The standard briefing schedule set forth in the Court's Local Rules will apply thereafter.

      **SO ORDERED.**

*/s/ Charles E. Atchley, Jr.*
**CHARLES E. ATCHLEY, JR.**
**UNITED STATES DISTRICT JUDGE**
